# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM WHITAKER, )
)
        Plaintiff, )
)
        v. ) 02: 06cv0610
)
HOLY FAMILY SOCIAL SERVICES, )
)
        Defendant. )

## MEMORANDUM OPINION AND ORDER OF COURT

February 27, 2008

       Presently before the Court for disposition is the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendant, Holy Family Social Services ("Holy Family") (*Document Nos. 27 and 28,* respectively), and the brief in opposition filed by Plaintiff, William Whitaker (*Document No. 35*), the REPLY BRIEF filed by Holy Family (*Document No. 38*), and the RESPONSE TO REPLY BRIEF filed by Plaintiff (*Document No. 41*).

       The issues have been fully briefed and the matter is ripe for disposition. After a careful consideration of the motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff on his claims of race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). Accordingly, the motion for summary judgment will be granted.

**PROCEDURAL BACKGROUND**

Plaintiff, William Whitaker ("Plaintiff"), brought this lawsuit on May 4, 2006, by the filing of a two-count Complaint against his former employer, Holy Family. Plaintiff alleges that his employment was unlawfully terminated on the basis of his race.

Holy Family has filed the instant motion for summary judgment in which it contends that it is entitled to judgment as a matter of law because Plaintiff is unable to establish a *prima facie* case of race discrimination or, in the alternative, that Plaintiff had not adduced any evidence from which a reasonable factfinder could either (i) disbelieve Holy Family's articulated non-discriminatory reason for the termination of Plaintiff's employment or (ii) believe that an invidious discriminatory reason was more likely than not a determinative cause for its decision.

**BACKGROUND**

As the law requires, all disputed facts and inferences are to be resolved most favorable to the Plaintiff.

Holy Family is a social service agency that provides care, treatment and education services to abused and neglected children and their families. Holy Family provides services under three core programs: (i) the Residential Program; (ii) the In-Home Program; and (iii) the Drug and Alcohol Outpatient Program. The Residential Program provides services to children between the ages of 6 and 18 who are no longer in the care of their families due to reasons of abuse, neglect, abandonment, or the inability of the parents to meet the emotional needs of their child. The children in the Residential Program live under the care and control of Holy Family in one of several facilities either owned or managed by Holy Family.

The principal residential facility of Holy Family is located in Emsworth, Pennsylvania, where children reside in group homes or cottages. In addition to the residential facilities at Emsworth, Holy Family also provides residential treatment in semi-independent living programs in apartment settings. One of the apartment facilities is located at the Alder Ridge apartment complex in Ross Township, Allegheny County, Pennsylvania. In April 2004, the time period relevant to this action, Holy Family had three (3) apartments in that apartment complex, including Apartments 901 and 902.

Plaintiff was hired by Holy Family in May 2002, as a Primary Youth Counselor. Primary Youth Counselors are trained to avoid physical confrontations with residents and to manage situations in a non-violent manner. "Passive physical restraint," which involves placing hands on the resident to physically control them, is to be used sparingly and only as a last resort. Even when a resident physically assaults a staff member, Primary Youth Counselors are trained to block the resident's punches and move away and, when possible, obtain the help of another staff member.

Where there is an incident of physical contact between a Primary Youth Counselor and a resident of Holy Family, the Primary Youth Counselor's immediate supervisor is "responsible for evaluating the situation." Specifically, the supervisor "evaluates the incident, the precipitating event, the event itself, the interventions used, the prior interventions used, and then based on the evaluation of it, other steps follow." If the supervisor concludes there is no misconduct, the supervisor signs the incident report and Elizabeth Stephenson, the Residential Program Director, reads and signs the incident report. If the supervisor concludes that there was misconduct on the part of the staff member, the supervisor reviews with Ms. Stephenson

the results of the investigation and any plan of correction, including a recommendation on discipline, that he or she has developed. Ms. Stephenson does not conduct the investigation.

In cases in which the supervisor has recommended termination, Ms. Stephenson reviews the supervisor's recommendation and discusses the recommendation with Keith Neyland, the Director of Human Resources of Holy Family, and Kevin Jenkins, Executive Director of Holy Family.

Upon being hired, Plaintiff received approximately eight (8) hours of crisis intervention training. A year later, in May 2003, he received additional crisis management training.

When Plaintiff was hired, he was initially assigned to King Hall, one of the cottages at the Emsworth facility. In February 2003, Plaintiff was transferred to the apartment setting and assigned to Apartment 901 at Alder Ridge apartment complex, where he was responsible for four (4) teenage boys. During the school year, Plaintiff generally worked the 3:00 p.m. to 11:00 p.m. shift, and another counselor worked during the 11:00 p.m. to 7:00 a.m. shift, after which the boys went to school.

At the time of the incident giving rise to this lawsuit, Plaintiff had been a Primary Youth Counselor in Apartment 901 for approximately fourteen (14) months and lived in Apartment 901 with JR, the boy involved in the incident that resulted in Plaintiff's termination; GM; and BW for between nine (9) and fourteen (14) months. The fourth boy, RT, who was not

present when the incident occurred, had moved into the apartment approximately three (3) months earlier.[1]

On April 29, 2004, Plaintiff arrived at Apartment 901 to begin his shift at 2:30 p.m. and then went to pick up the boys from school. Plaintiff testified that nothing unusual occurred in the vehicle during the drive from school to the Alder Ridge apartments. Plaintiff testified that once at the apartment, he found out from one of the other boys that JR had a cigarette lighter in his possession. Plaintiff told JR that if he did in fact have a cigarette lighter JR needed to give it to Plaintiff as it was against regulations to be in possession of a lighter. JR stated that he did not have a lighter and walked back into his bedroom.

A short time later, as Plaintiff was sitting on a small sofa in the living room of the apartment watching television, he saw, out of the corner of his eye, JR walk into the room and saw a "projectile" come across his path. The lighter came to rest in front of Plaintiff on the floor. Plaintiff testified that he did not see JR toss the lighter and Plaintiff was not hit with the lighter.

After JR tossed the lighter, JR did not move towards Plaintiff and instead put his hands back in his pockets and starting walking away from the Plaintiff. Plaintiff testified that he "got off the couch" and "walked up to [JR] approximately maybe two feet away from him." JR kept his hands in his pockets and Plaintiff testified that he repeatedly told JR to take his hands out of his pockets and let him see what else he had in his hands, but that JR refused and kept his hands in his pockets. Plaintiff testified that his head "accidentally" contacted JR's

---

[1] To protect the confidentiality of the minor residents involved in this matter, initials have been used in place of the full names of the residents.

5

head. Plaintiff also testified that JR struck him on the left side of his head, hitting his left ear, that Plaintiff grabbed JR's arm, and both JR and Plaintiff fell onto the small sofa and then onto the floor. Plaintiff testified that he was momentarily dazed by JR's punch, and that his knees buckled.

As a result of the altercation with Plaintiff, JR suffered facial injuries, including a large welt around his eye, and bruises and abrasions to other parts of his body.

The other boys in Apartment 901 asked Mr. Paris Akins, the Primary Youth Counselor in Apartment 902, to come over to Apartment 901 and assist with the situation which had arisen between JR and Plaintiff.

Scott Schreiber, Plaintiff's immediate supervisor, arrived at Apartment 901 shortly after Plaintiff's incident with JR. Mr. Schreiber immediately began to investigate the incident. Mr. Schreiber testified that Plaintiff told him that "he had to restrain [JR] . . . that [JR] threw a lighter at him and that [JR] punched him." Plaintiff also told Mr. Schreiber that JR's injuries to his face occurred when JR rolled off the couch and onto the floor.

Within one-half hour of the incident, Mr. Schreiber spoke with JR, who told him that "Mr. Bill restrained him. Mr. Bill punched him." JR also stated that "Mr. Bill headbutted him, that he punched him." According to Mr. Schreiber, JR further stated that "Mr. Bill got into his face, backed him up against - he said corner, but was more or less between the chair and the wall and the table, and that he was very upset."

Because JR had been injured, within one hour of the incident, Mr. Schreiber transported JR to the nurse's office located at Holy Family's Emsworth campus. According to Mr. Schreiber, during the ride to the nurse's office, JR told him that the Plaintiff had headbutted

6

him three (3) times and punched him. At the nurse's office, JR told Elizabeth Stephenson, the Director of Residential Program for Holy Family, that the Plaintiff had punched him.

Both Mr. Schreiber and Ms. Stephenson testified that they immediately noticed the severity of JR's injuries. Specifically, Mr. Schreiber testified that "[f]irst [he] noticed that [JR] has a large mark under his left eye, a golf ball size welt that was red and swollen." Plaintiff testified that he was not surprised that JR had to be taken to the emergency room because of his injuries.

After the nurse at Holy Family examined JR, he was transferred to the emergency room at Sewickley Valley Hospital. Photographs were taken of the injuries sustained by JR.

Mr. Schreiber returned to Apartment 901 and informed Plaintiff that due to the nature of JR's allegations, Plaintiff had to be removed from the apartment and was suspended indefinitely until Holy Family could complete its internal investigation.

Plaintiff completed an Incident Report and a Client Injury Report. Both reports reflect that JR suffered injuries to his face and wrist. The reports also confirm that Plaintiff notified Mr. Schreiber of the injuries to JR and that Plaintiff had to give JR an ice pack to relieve the swelling.

Mr. Schreiber interviewed GM and BW, two of the boys living in the apartment who had witnessed the incident. Both boys described the incident in the same manner: that JR had thrown a lighter at the Plaintiff, that Plaintiff asked JR why he had thrown a lighter at him, that Plaintiff got into JR's face and that Plaintiff headbutted JR and backed him into the corner between the sliding doors and the table.

Mr. Schreiber assessed Plaintiff's version of how JR sustained his injuries, but he concluded "that the injuries were more congruent with a punch . . . ." Based on his investigation, Mr. Schreiber recommended that Plaintiff be terminated. He conveyed his recommendation to Ms. Stephenson and Keith Neyland, the Director of Human Resources for Holy Family.

Ms. Stephenson and Mr. Neyland discussed Plaintiff's conduct and the results of Mr. Schreiber's investigation to determine the appropriate discipline. After weighing all the factors, Ms. Stephenson and Mr. Neyland agreed with Mr. Schreiber's recommendation that Plaintiff should be terminated. Ms. Stephenson and Mr. Neyland took their recommendation to Kevin Jenkins, the Executive Director of Holy Family, for his approval, who in turn approved the recommendation to terminate Plaintiff's employment.

On May 3, 2004, Plaintiff was notified via a telephone call from Mr. Schreiber and Mr. Neyland that his employment was terminated. Mr. Schreiber informed Plaintiff that the findings of Holy Family were not consistent with the reports prepared by Plaintiff.

As a result of the injuries sustained by JR, Holy Family was required to report the incident to the Pennsylvania Department of Public Welfare ("DPW") "Child Line." The DPW conducted an investigation of the incident and, by letter dated June 4, 2004, concluded that a finding of child abuse was "Indicated" against Plaintiff. The DPW's decision was made completely independent of Holy Family's investigation and Ms. Stephenson testified that the decision of DPW did not play a role in the decision of Holy Family to terminate Plaintiff's employment.

On June 16, 2004, the Ross Township police department filed criminal charges against Plaintiff. However, the police eventually withdrew the charges because JR was not available to testify in the criminal proceeding.

On August 8, 2005, the Commonwealth of Pennsylvania Department of Public Welfare Bureau of Hearings and Appeals entered a Final Administrative Action Order, which adopted the Recommendation of the Administrative Law Judge, entered August 4, 2005, which recommended that Plaintiff's appeal from an indicated report of child abuse be sustained.

## STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

With respect to summary judgment in discrimination cases, the Court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987). The task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory or retaliatory purpose. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 525 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993).

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

### DISCUSSION

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 20002-2(a)(1).[2] The

---

[2] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.*, 94 3 F.3d 102, 104 (3d Cir. 1996). Therefore, the disposition of Plaintiff's Title VII claims applies with equal force to his PHRA claims.

familiar *McDonnell Douglas* burden-shifting framework does not apply if there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). "Direct evidence" is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 n. 4 (3d Cir. 1995). Plaintiff essentially admits that he has no direct evidence of race discrimination.[3] Therefore, the Court will employ the *McDonnell Douglas* burden-shifting framework.

In order for Plaintiff to establish a *prima facie* case of race discrimination, he must establish by a preponderance of the evidence (i) that he is a member of a protected class; (ii) that he is qualified for the position in question; (iii) that he suffered an adverse employment action; and (iv) that circumstances exist that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person outside of the protected class is treated more favorably. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999).

If Plaintiff establishes a *prima facie* case, the burden shifts to Holy Family to articulate a legitimate, non-discriminatory reason for its employment decision. Once Holy Family establishes such a reason, Plaintiff must point to specific evidence of record from which a reasonable factfinder either (i) could disbelieve Holy Family's articulated non-discriminatory

---

[3] Specifically, Plaintiff testified at his deposition as follows:

Q: No one at Holy Family said anything to you that indicated that race was a factor in the decision to terminate your employment.

A: No. No one told me that.

(Pl's depo. at 115.)

11

reasons for the termination of Plaintiff's employment; or (ii) could believe that an invidious discriminatory reason was more likely than not a determinative cause of the employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Holy Family contends that summary judgment should be granted in its favor because Plaintiff cannot establish a *prima facie* case of race discrimination or, in the alternative, there is no evidence of record from which a reasonable factfinder could either (i) disbelieve Holy Family's articulated non-discriminatory reason for the termination of Plaintiff's employment; or (ii) believe that an invidious discriminatory reason was more likely than not a determinative cause of the termination of Plaintiff's employment.

A. *Prima Facie Case*

Holy Family does not contest Plaintiff's *prima facie* case with respect to elements one, two, and three. Holy Family has asserted, however, that Plaintiff has failed to establish the fourth and final element of his *prima facie* case, *to wit*: he has not identified a similarly situated member of the non-protected class who was treated more favorably than Plaintiff. As a comparator, Plaintiff has identified Mr. Joe Dodaro, a non-member of the protected class, who was not terminated from Holy Family after he had two (2) altercations with residents. Holy Family disputes that Joe Dodaro is a proper comparator. Thus, Holy Family argues that the individual identified by Plaintiff can not support an inference of discrimination.

In 2002, Mr. Dodaro was involved in an incident with JS, a Holy Family resident. JS and the other residents of Holy Family had been at Kennywood Park. On the return van ride to Holy Family, JS became disruptive. When the van arrived at Holy Family, JS exited the van through the emergency exit and ran from the van in the opposite direction of King Hall where he

lived. Mr. Dodaro testified that he thought JS was attempting to run off of Holy Family grounds and, therefore, Mr. Dodaro began to run after JS, calling for him to return.

Mr. Dodaro further testified that JS, after running a short distance, stopped, turned and charged towards him "swinging punches." Mr. Dodaro tried to evade one punch, but JS struck him in the back of the head. JS "continued to swing punches" at Mr. Dodaro. Mr. Dodaro continued to try to block JS's punches, but eventually Mr. Dodaro and JS fell to the ground. Another supervisor, Keith Gray, came to assist and together Messrs. Dodaro and Gray were able to restrain JS.

Mr. Shawn DeChillis was Mr. Dodaro's supervisor at the time of the incident with JS. He investigated the incident, reviewed the incident report completed by Mr. Dodaro, and spoke to Mr. Dodaro and JS. Mr. DeChillis testified that he observed that Mr. Dodaro's account of the incident was the same as JS's account of the incident. Mr. DeChillis also determined that the injuries JS sustained were minor, consisting of a "few abrasions that would be consistent with like if he fell on the concrete."

Mr. DeChellis determined that Mr. Dodaro's intervention with JS was effective "because of the immediacy of the resident telling me that he punched Mr. Dodaro and had no intention of stopping punching Mr. Dodaro." Mr. Dodaro was issued a written warning because "Staff member performed a single person takedown on a restraint. This violates DPW regulation against single person restraints."

On November 11, 2003, Mr. Dodaro was involved in an incident involving ID, another resident of Holy Family. ID was one of seven residents under Mr. Dodaro's sole supervision at one of the Holy Family group homes. Mr. Dodaro asked all seven boys to go

13

upstairs to get cleaned up because the boys had been playing basketball. ID refused to go upstairs and instead went to the basement of the house. Mr. Dodaro followed him to the basement and again asked ID to follow his direction to go upstairs. ID then went to the main level of the house, went into the kitchen, got a 64-ounce bottle of soda, and started to go upstairs.

Mr. Dodaro told ID that he could not go upstairs with the bottle of soda and reached to take the bottle out of ID's hands. ID immediately became aggressive and repeatedly hit Mr. Dodaro with his elbows and attempted to hit him with his head. Mr. Dodaro testified that as he tried to protect himself, his feet became entangled with ID's feet and they both fell to the ground.

Loretta Dulski, Supervisor, investigated the incident involving ID. Mr. Dodaro was issued a written warning and a three day suspension and mandated to take crisis prevention.

To be sure, the issue of whether Joe Dodaro and Plaintiff are similarly situated is a close call. Although Mr. Dodaro was an Assistant Supervisor, while Plaintiff was a Primary Youth Counselor, Mr. Dodaro served as a Primary Youth Counselor during that the time that he was involved in the altercations with JS and ID. However, while working in the residential program, Mr. Dodaro and Plaintiff reported to different Residential Program Supervisors, however those supervisors each reported directly to Elizabeth Stephenson, the Residential Program Director of Holy Family. The Program Supervisors lacked the authority to conclude the investigation, or impose discipline, without Ms. Stephenson's involvement or approval.

As stated *supra,* Plaintiff's burden is not onerous at this stage and evidence that demonstrates an inference of discrimination in connection to the adverse employment action is

14

sufficient. Thus, for the purpose of this Memorandum Opinion only, the Court finds and rules that Plaintiff has established a *prima facie* case for disparate treatment.

B.      *Legitimate, Non-Discriminatory Reason*

Because Plaintiff has established a *prima facie* case of discrimination, the burden shifts to Holy Family to articulate a legitimate, non-discriminatory reason for the termination of Plaintiff's employment. Holy Family asserts that Plaintiff's employment was terminated because of his conduct on April 29, 2004, specifically that he provoked and was the aggressor in an altercation with JR, which altercation caused serious injury to JR. The Court finds that Holy Family has met its burden and has offered a legitimate and non-discriminatory reason for the termination of Plaintiff's employment.

C.      *Pretext*

Under the *McDonnell Douglas* framework, because Holy Family has offered a legitimate and non-discriminatory reason for its employment decision, Plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that Holy Family's explanation was pretextual. *Reeves*, 530 U.S. at 143.

> Pretext is not demonstrated by showing simply that the employer was mistaken . . . Instead the record is examined for evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons.

*Sempier v. Johnson & Higgins,* 45 F.3d 724, 731 (3d Cir.), *cert. denied*, 515 U.S. 1159 (1995). Our Court of Appeals for the Third Circuit has explained that to defeat a summary judgment motion, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Olson v. GE Astrospace,* 101 F.3d 947, 951-52 (3d Cir. 1996). Thus, in order to defeat a motion for summary judgment, Plaintiff must identify evidence that establishes a reasonable inference that Holy Family's proffered non-discriminatory explanation "is unworthy of credence.*"* *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 268 (3d Cir. 2005).

The particular criteria identified by Holy Family as the reason that Plaintiff's employment was terminated was because it had determined, through its own internal investigation, that the physical intervention utilized by Plaintiff was excessive. Plaintiff responds that Holy Family "has offered varying reasons for [Plaintiff's] termination" and the "ever-changing" proffered reasons may be viewed as evidence tending to show pretext. Pl's Response at 16.

After a careful and thorough review of the entire summary judgment record, the Court finds and rules that Holy Family has consistently maintained that Plaintiff's employment was terminated because of his improper behavior, *i.e.*, excessive use of physical intervention toward a residential client.

For example, on an unemployment form entitled "Employer's Notice of Application," completed by Mr. Neyland on May 17, 2004, Mr. Neyland wrote under "2. Reason for Separation or Partial Unemployment . . ., Claimant headbutted a child during a restraint. Claimant admits that he engaged in such misconduct."

On an "Allegations of Child Abuse" form dated June 4, 2004, completed by Ms. Stephenson and signed by her and Mr. Jenkins, she wrote: "Based on the severity of [JR's] injuries . . . and witnesses statements and the non-approved restraint technique and the restraint not being warranted [Plaintiff] was terminated. Also, note that [JR] alleged that [Plaintiff] headbutted him three times, and punched him during the restraint."

On the form entitled "Holy Family Services Client Injury Report," in the section called "Supervisors Only," Mr. Schreiber wrote: "The use of physical intervention was excessive. The staff member is no longer employed with Holy Family." And in the same form, under "Resolution," Mr. Schreiber wrote: "This injury occurred during a restraint. The use of physical intervention was excessive by the staff member - the staff member's employment was terminated."

In Defendant's Answer to Charge of Discrimination and Position Statement, filed with the PHRC, completed by Mr. Neyland and signed on February 5, 2005, paragraph 9 stated: "Denied. Complainant was terminated because he headbutted a young resident thereby engaging in unacceptably abusive behavior toward a residential client."

In Defendant's Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents Directed to Defendant, Holy Family responded to an interrogatory which inquired as to the reason(s) why Plaintiff was terminated by Holy Family, "Plaintiff was terminated as a result of his grossly improper conduct, which constituted an assault against [JR,] a seventeen year old resident. Plaintiff, who was responsible for the resident's care and well

being, caused serious injuries to [JR.]  In addition, Plaintiff had been previously disciplined by Defendant."[4]

The record is clear that at every point, from the initial investigation of the incident throughout this litigation, Holy Family has consistently maintained that Plaintiff was terminated because of his improper behavior.  In each instance, Holy Family described the same set of facts relating to the same improper conduct towards JR. The Court finds that the different terminology used to characterize this conduct - whether it be "unacceptably abusive behavior," "grossly improper conduct," or "provoked and was the aggressor in an altercation with a minor resident" - all describe the same conduct which was determined by Holy Family through its internal investigation to be improper and grounds for immediate termination.

Although the Plaintiff disagrees with the business decision of Holy Family, the Court finds that Plaintiff has simply failed to present any evidence to establish that race was a factor in the decision of Holy Family to terminate his employment or that his employment was terminated for reasons other than those articulated by Holy Family.

---

[4] The record reflects that Plaintiff was disciplined on three occasions prior to his termination:  In August 2002, Plaintiff was issued a written warning for restraining a resident of Holy Family by using a "basket hold" in violation of DPW regulations.  In May 2003, Plaintiff was counseled afer a female driver reported that the agency van he was driving forced her into the next lane and that the driver "gave her the finger."  In February 2004, Plaintiff was issued a one-day suspension for engaging in a verbal confrontation with a driver while transporting residents of Holy Family in an agency vehicle.   Plaintiff does not dispute these incidents, but argues that they are not relevant as his past discipline did not factor into Holy Family's decision to terminate Plaintiff's employment.

## Conclusion

For the reasons discussed *supra*, the Court finds that Plaintiff has not presented any evidence that Holy Family intentionally discriminated against him because of his race. Therefore, the Motion for Summary Judgment filed by Holy Family will be granted in its entirety. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM WHITAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 06cv0610 |
| | ) | |
| HOLY FAMILY SOCIAL SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

AND NOW, this 27th day of February, 2008, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the Motion for Summary Judgment filed by Defendant, Holy Family Social Services, is **GRANTED** and judgment is hereby entered in favor of Holy Family Social Services.

The Clerk is directed to docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc: David B. Spear, Esquire
Goldman Schafer & Spear
Email: david@gss-law.net

James R. Haggerty, Esquire
Cohen & Grigsby, P.C.
Email: jhaggerty@cohenlaw.com

Shweta Gupta, Esquire
Reed Smith
Email: sgupta@reedsmith.com